## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ROBIN MAROCCHINI**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **CIVIL ACTION NO. 20-0356-CG-N** |
| | ) | |
| **ROBERT C. BROWN AND** | ) | |
| **ROBERT C. BROWN, M.D., P.C.,** | ) | |
| **d/b/a BROWN, PEARSON &** | ) | |
| **GUEPET GYBNECOLOGY AND** | ) | |
| **UROGYNECOLOGY,** | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the court on Plaintiff's motion for partial summary judgment (Doc. 63), Defendant's opposition thereto (Doc. 68), and Plaintiff's reply (Doc. 69). For the reasons explained below, the Court finds that Plaintiff's motion for partial summary judgment should be granted.

## FACTS

Plaintiff, Robin Marocchini, filed this action seeking compensatory and punitive damages arising from her medical treatment and care by Defendant Dr. Robert C. Brown in 2019. (Doc. 46). Plaintiff's claims center around her allegation that Dr. Brown breached the standard of care owed to her by removing her ovaries and fallopian tubes against her wishes and without her consent. The Amended Complaint asserts four counts: (1) an Alabama Medical Liability Act claim (2) a

1

negligence and wantonness claim, (3) a claim for assault and battery and trespass to person, and (4) a claim for loss of consortium. (Doc. 46).

In December 2018, Plaintiff experienced problems with urinary incontinence and vaginal prolapse and sought treatment from Dr. Morris Silver, a urogynecologist in Destin, Florida. (Doc. 67-2, PageID.608-09).  Plaintiff and Dr. Silver discussed several different options to attempt to alleviate Plaintiff's issues. (Doc. 67-2, PageID.609).  Based on discussions with Dr. Silver and research she did on her own, Plaintiff decided to have a hysterectomy. (*Id*.).  Dr. Silver also discussed with Plaintiff whether to remove her ovaries or to preserve them. (Doc. 67-2, PageID.609-10).  Dr. Silver explained to her the risks and benefits of keeping her ovaries, including the risk of ovarian cancer which is low: statistically .1 percent according to Dr. Silver. (Doc. 63-11, PageID.454).  Plaintiff's ovaries were not part of her prolapse problem and she decided, after much research, not to have them removed. (Doc. 67-2, PageID.610).  On January 30, 2019, Dr. Silver performed a hysterectomy on Plaintiff and did not remove her ovaries, leaving them intact as Plaintiff wished. (Doc. 63-3, PageID.347).  After the surgery, Plaintiff says the surgery seemed to work but several months later "it started to fail" and she "felt something coming down" similar to what she had felt before. (Doc. 67-2, PageID.610).

On October 15, 2019, Plaintiff went to see Dr. Brown for continuing problems with prolapse. (Doc. 63-3, PageID.332-34).  Plaintiff alleges that at this initial visit

2

she provided Dr. Brown with a copy of her prior medical records which included an operative report from her hysterectomy. Defendants do not admit to receiving the records at the initial visit,[1] but a copy of Plaintiff's operative report from her hysterectomy was contained in Defendant's records and Dr. Brown's notes from Plaintiff's visit state that he "[r]eviewed records brought to office by patient from surgery in 1/2019." (Doc. 63-3, PageID.334, 347).  The hysterectomy operative report states that a total vaginal hysterectomy with an anterior repair and posterior repair was performed and does not state that an oophorectomy (which is the removal of one or both ovaries) was performed. (Doc. 63-3, PageID.347).  The hysterectomy operative report includes a detailed description of the removal of Plaintiff's cervix and uterus and does not mention the removal of ovaries or describe any procedures to remove ovaries. (*Id*.).  Dr. Brown testified that he read the report and although it did not contain the word oophorectomy anywhere in the report, Dr. Brown believed Plaintiff's ovaries had been removed. (Doc. 63-4, PageID.359-60).  Dr.

 Brown testified that he did not ask Plaintiff about her ovaries because "99-plus percent of patients" who are over 50 and menopausal have their ovaries removed when they have a hysterectomy. (Doc. 63-4, PageID.356).  According to Dr. Brown, Plaintiff may not have even known what was removed during the surgery, including whether her ovaries had been removed. (Doc. 63-4, PageID.355).

---

[1] Defendants deny this allegation in their Answer to the Amended Complaint. (Doc. 71, PageID.817). Defendant's Answer was filed on June 6, 2021, after this summary judgment motion was filed.

During the initial visit, Dr. Brown completed an exam and discussed with Plaintiff her options: specifically, to do nothing, to try a pessary, or to have sacrocolpopexy surgery to implant mesh. (Doc. 63-3, PageID.334). Dr. Brown then scheduled sacrocolpopexy surgery to implant mesh. (Doc. 63-3, PageID.334; Doc. 63-4, PageID.373-75). The removal of Plaintiff's ovaries was *not* discussed. Plaintiff gave her consent for the sacrocolpopexy surgery. (Doc. 63-4, PageID.375).

Plaintiff had a pre-operative appointment on November 5, 2019. (Doc. 67-2, PageID.613). During the pre-op appointment, Plaintiff signed a surgical consent form which stated that she "voluntarily request Dr. Robert C. Brown and his/her associates to treat my condition as deemed necessary." The consent form specified that her "proposed treatment is: Robot Assisted Sacrocolpopexy and possible posterior repair and any other indicated procedures." (Doc. 67-3, PageID.646; Doc. 67-2, PageID.629). The surgical consent form also stated:

> I understand that my physician may discover other or different conditions which may require additional or different procedures than those planned. I authorize my physician and my associates to perform such other procedures which are advisable in their professional judgment.

(Doc. 67-3, PageID.646).

At the pre-op appointment Plaintiff also signed a "record of consent" form which includes the following:

> 1. I Robin Marocchini authorize and direct Dr. Robert Brown and/or such assistants as may be selected by him to the performance of the following procedure: Robot assisted sacrocolpopexy, and any other

4

indicated procedures, possible posterior repair which involves: "a sacrocolpopexy"

2. It has been explained to me that during the course of the operation or procedure unforeseen conditions may be revealed that necessitate an extension of the original procedure (s) or different procedure (s) than those set forth in Paragraph One. I therefore authorize and request that the above-named physician, his assistants or his designees perform such procedures, including blood transfusion as are necessary and desirable in the exercise of his professional judgment.

(Doc. 67-4, PageID.648).

Dr. Brown performed the surgery on November 11, 2019. (Doc. 67-2, PageID.613).  Dr. Brown talked with Plaintiff and her husband before the surgery and discussed what she was having done. (Doc. 67-2, PageID.13; Doc. 67-5, PageID.652).  Plaintiff was then taken to surgery and her husband went to the waiting room. (Doc. 67-5, PageID.652).  During the surgery Dr. Brown found that Plaintiff still had her ovaries, and he stopped the surgery. (Doc. 63-4, PageID.359; Doc. 67-1, PageID.560).  Dr. Brown asked the nurse to contact Plaintiff's husband and Dr. Brown then spoke to her husband on the phone. (Doc. 67-1, PageID.560). Dr. Brown reports that his conversation with Plaintiff's husband was as follows:

I called him and said "Mr. Marocchini, I have gotten in here. I see that your wife has ovaries. Did you realize that she still has ovaries?" And he said, "No. I thought they were removed at the time of her hysterectomy." And I said, "Well, what do you think that she would want? What would be her wishes if – as far as the surgery, whether she want – do you think she wants to keep her ovaries or doesn't?" And he told me that he thought she would want them removed. He said, "what do you think?" And I said, "Well, she's over 50. She's probably needs to start on hormone – or needs to discuss hormone replacement therapy. It's up – you know, whatever you think." And I said "You know, she has ovaries in place. What do you think?" And he said, "I think I would want – she would want them removed." ... I said, "We

5

can leave them or we can remove them. If we remove them, that gets
rid of her or decreases significantly her risk of ovarian cancer."

(Doc. 67-1, PageID.560-61).  The phone call lasted 77 seconds. (Doc. 63-5,

PageID.381).  The Court notes that Plaintiff's husband has a different account of his

telephone conversation with Dr. Brown, but for purposes of this summary judgment

motion, the Court will view the facts in the light most positive to the non-moving

parties and will assume Dr. Brown's account is accurate.

Plaintiff's husband did not have, and has never had, a general or healthcare

power of attorney for Plaintiff. (Doc. 63-7, PageID.397).  According to Plaintiff's

husband, outside of an emergency, he had no authority to make healthcare

decisions for Plaintiff. (*Id.*).

Dr. Brown testified that the ovaries did not have to be removed but, in his

opinion, it was in her best interest for her ovaries to be removed, and his

consultation with Plaintiff's husband confirmed Dr. Brown's plan. (Doc. 67-1,

PageID.556-57).  According to Dr. Brown, there was no requirement that he remove

the ovaries but there was "a need" to remove them to decrease the 1.2 percent

chance that she had of getting ovarian cancer. (Doc. 67-1, PageID.557).  Dr. Brown

did not know if Plaintiff was menopausal but testified that looking at her ovaries

during the surgery, they appeared to be perimenopausal or menopausal because

they had atrophied some. (Doc. 67-1, PageID.564).  Dr. Brown testified that

Plaintiff's ovaries also had some postoperative adhesions from her prior surgery.

(Doc. 67-1, PageID.559).  Dr. Brown testified that using his professional judgment

6

and the information he had gathered, including his discussion with Plaintiff's husband, Dr Brown removed Plaintiff's ovaries. (Doc. 67-1, PageID.556). According to Dr. Brown, he did what was in Plaintiff's best interest. (Doc. 67-1, PageID.570). A surgical pathology report states that Plaintiff's ovaries and fallopian tube had "no significant pathologic change." (Doc. 63-3, PageID.335).

Dr. Brown testified that it was his practice to always get consent before performing procedures on women and that it was very important to discuss it so that patients have the ability to decide what is done and have the risks, benefits, and alternatives. (Doc. 63-4, PageID.350-51). Plaintiff's expert, Dr. Catherine Matthews, opined that it is the "standard of care for any surgeon to obtain written informed consent prior to removing any part of a woman's body." (Doc 63-12, PageID.499). Dr. Silver agreed that outside of an emergency situation, it is a breach in the standard of care to remove a woman's ovaries without her express consent. (Doc. 63-11, PageID.456).

Defendants' expert, Dr. Brent Parnell, also testified that meeting the ethical obligations of informed consent requires that a doctor give the patient adequate, accurate, and understandable information and requires that the patient have the ability to understand and reason through this information and be free to ask questions to make an intentional and voluntary choice. (Doc. 63-6, PageID.388). However, Dr. Parnell also opined the following:

My opinion was that after having an intraoperative finding that was

7

unexpected and having a discussion with her husband regarding Mrs. Marocchini's desires, that he made a reasonable decision intraoperatively.

(Doc. 67-7, PageID.710-11).  Dr. Parnell restated his opinion as follows:

> I believe that with Dr. Brown's understanding of the situation and then his conversation with Mr. Marocchini, where he gathered the information that he could gather, it was a reasonable decision to proceed with the oophorectomy.

(Doc. 67-7, PageID.726).  However, Dr. Parnell testified that he did not recall ever taking out a normal set of ovaries without a patient's consent when he was doing a sacrocolpopexy and he would typically not remove ovaries that appeared normal for her age and were not hindering his surgery "unless I had some other understanding that would cause me to believe they needed to be removed." (Doc. 63-6, PageID.391-92).

## DISCUSSION

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted: "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for

that party.' " *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting *Anderson*, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *See Anderson*, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. *O'Ferrell v. United States*, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 524 (11th Cir. 1994) (citing

9

Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).  Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response .... must be by affidavits or as otherwise provided in this rule be set out specific facts showing a genuine issue for trial." *Vega v. Invsco Group, Ltd.*, 2011 WL 2533755, *2 (11th Cir. 2011).  "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

**B. Plaintiff's Summary Judgment Claims**

Plaintiff's summary judgment motion seeks a determination that Dr. Brown breached the standard of care for a urogynecologist while acting in the line and scope of his employment with Brown, Pearson & Guepet Gynecology and Urogynecology when he removed Plaintiff's ovaries but failed to obtain fully

10

informed consent from Plaintiff. Specifically, Plaintiff asserts that Dr. Brown failed to inform Plaintiff that one of the material risks associated with her surgery was the potential removal of her ovaries. (Doc. 63-1, PageID.301).  The summary judgment motion seeks only a determination of liability and does not seek a determination as to damages.

A claim for breach of the standard of care for failure to obtain fully informed consent falls under the Alabama Medical Liability Act (AMLA).  The AMLA imposes upon physicians a duty to "exercise such reasonable care, diligence and skill as physicians ... in the same general neighborhood, and in the same general line of practice, ordinarily have and exercise in a like case." *Pruitt v. Zeiger*, 590 So. 2d 236, 237 (Ala. 1991) (quoting ALA. CODE 1975, § 6–5–484(a)).  To establish medical malpractice under the AMLA, a plaintiff, must establish "1) the appropriate standard of care, 2) that the defendant health-care provider breached that standard of care, and 3) a proximate causal connection between the health-care provider's alleged breach and the identified injury." *Bain v. Colbert Cty. Nw. Alabama Health Care Auth.*, 233 So. 3d 945, 953 (Ala. 2017) (citations omitted).  "This is true whether the particular care concerns consent, treatment, or consultation with other medical professionals." *Est. of Keith v. Munoz*, 2013 WL 12147713, at *2 (N.D. Ala. Sept. 10, 2013) (citation omitted).  "The plaintiff in a medical malpractice action must ordinarily establish the defendant physician's negligence through expert testimony as to the standard of care and the proper medical treatment." *Pruitt*, 590

11

So.2d at 237-38 (citing *Bates v. Meyer*, 565 So.2d 134, 136 (Ala.1990)).   "[A]n
exception exists when the breach of the standard of care is obvious to the average
layperson, *Id.* at 238 (citing *Ellingwood v. Stevens*, 564 So.2d 932 (Ala.1990); *Bell v.
Hart*, 516 So.2d 562 (Ala.1987)).   "The plaintiff must also prove by expert testimony
that the physician breached the standard of care and by the breach proximately
caused the plaintiff's injury." *Giles v. Brookwood Health Servs., Inc.,* 5 So. 3d 533,
549 (Ala. 2008) (citation and internal quotations omitted).

In cases where the plaintiff alleges the physician breached the standard of
care by failing to obtain informed consent, the Supreme Court of Alabama has found
that the standard of care is breached where: (1) the physician "fail[ed] to inform the
plaintiff of all material risks associated with the procedure," and (2) "a reasonably
prudent patient, with all the characteristics of the plaintiff and in the position of
the plaintiff, would have declined the procedure had the patient been properly
informed by the physician." *Phelps v. Dempsey*, 656 So. 2d 377, 380 (Ala. 1995)
(citing *Fain v. Smith*, 479 So.2d 1150 (Ala.1985); *Fore v. Brown*, 544 So.2d 95
(Ala.1989)).

In the instant case, Plaintiff claims Dr. Brown failed to inform her that one of
the material risks associated with her surgery was the potential removal of her
ovaries. The evidence is clear that Dr. Brown did not discuss with Plaintiff anything
about her ovaries, much less the potential "risk" that they might be removed during
the surgery. However, in a typical informed consent case a problem arises from a

doctor's performance of the intended procedure. Here, there has been no suggestion that the prolapse surgery itself resulted in a bad outcome that Plaintiff was unaware could happen, but instead that the doctor performed an unnecessary procedure that was unrelated to the prolapse surgery she had consented to have done. So, though Dr. Brown clearly did not inform Plaintiff of the risk, the real question here is whether Dr. Brown had consent to remove Plaintiff's ovaries.

There are two consent related documents which Plaintiff signed before her surgery. The Court notes that it is generally "the province of the court, not the jury, to construe a [contract], even though ambiguous and unclear ...." *Mega Life And Health Ins. Co. v. Pieniozek*, 516 F.3d 985, 992 (11th Cir. 2008) (quoting *Home Indem. Co. v. Employers Nat'l Ins. Corp.*, 564 So.2d 945, 947 (Ala.1990)). "[T]he court, as a matter of law, should apply rules of construction and attempt to resolve any ambiguity in the contract before looking to factual issues to resolve the ambiguity." *Ohio Cas. Ins. Co. v. Holcim (US)*, 744 F. Supp. 2d 1251, 1259 (S.D. Ala. 2010) (citations omitted). In construing the language of contracts, Alabama courts recognize that "the words of a contract are to be given their ordinary meaning." Additionally, the Court should consider the contract as a whole and must construe any ambiguity against the drafter of the contract." *Murray v. Holiday Isle, LLC*, 620 F. Supp. 2d 1302, 1323 (S.D. Ala. 2009) (citations omitted).

The Court notes that the Supreme Court of Alabama has found that broad language contained in a medical consent form does not authorize unlimited "carte

blanche." *Black v. Comer*, 920 So. 2d 1083, 1091 (Ala. 2005).  In *Black,* the Court found that where the patient had consented to the doctor performing "additional operations and procedures he considered therapeutically necessary or advisable in the exercise of his professional judgment" the doctor could not act in whatever fashion he might subjectively think appropriate in the exercise of his professional judgment. *Id.*  The doctor was only authorized to perform procedures "considered therapeutically necessary or advisable under the objective standard of care that controls the exercise of professional judgment." *Id.*  Thus, where the consent form appeared to give the doctor complete discretion to perform any procedures that he found advisable in his own professional judgment, the Court read into the consent form the requirement that the procedure be necessary or advisable under the *objective standard of care.*  With the above tenets in mind, the Court turns to the language of the consent forms in this case.

In the first consent document, Plaintiff consented to Dr. Brown treating her prolapse condition "as deemed necessary." (Doc. 67-3, PageID.646).  The consent form she signed also stated that she understood that her physician may "discover other or different conditions which may *require* additional or different procedures." (*Id.* emphasis added).  Although the form also states that she authorized her physician "to perform such other procedures which are advisable in their professional judgment," that sentence immediately follows the other portions of the form that talk about the procedures being necessary or required. (*Id.*).  Accordingly,

14

viewing the contract as a whole, the phrase "such other" refers back to the necessary or required procedures. Thus, the consent form provides that such other necessary or required procedures may be performed if they are advisable in the doctor's professional judgment. The plain meaning of those words rules out an unrelated optional procedure. Dr. Brown removed Plaintiff's ovaries because he believed it was in Plaintiff's best interest, but it was not necessary or required. The reason Dr. Brown thought they should be removed had nothing to do with Plaintiff's prolapse condition and was not because of something that occurred during the prolapse surgery.

Plaintiff signed a second form, the "record of consent" form, which listed the procedure to be performed as follows: "Robot assisted sacrocolpopexy, and any other indicated procedures, possible posterior repair which involves: "a sacrocolpopexy. " (Doc. 67-4, PageID.648).  It stated that it had been explained to Plaintiff that during the operation "unforeseen conditions may be revealed that *necessitate* an extension of the original procedure (s) or different procedure (s) than those set forth in Paragraph One." (*Id.* emphasis added).  Again, the statement stated that what was explained to plaintiff regarded what might "necessitate" additional procedures. The form continued to state: "I therefore authorize and request that the above-named physician, his assistants or his designees perform such procedures, including blood transfusion as are necessary and desirable in the exercise of his professional judgment." This uses the word "therefore" to conclude from the previous statement

15

(which talks about *necessary* procedures) that "such procedures" are authorized "as are necessary and desirable."  The Court finds from the plain language of these forms that the consent forms did not authorize Dr. Brown to perform an unnecessary procedure that was not a part of or related to the condition she was having treated or the specific surgery that was listed and any complications that arose from the specifically listed surgery.

Plaintiff's husband reportedly consented to the procedure during a 77 second phone call while Plaintiff was unconscious. However, it has generally been held that such consent cannot be given except in emergency cases where the procedure is necessary. *See Schloendorff v. Soc'y of New York Hosp.*, 105 N.E. 92, 93 (1914), *abrogated by Bing v. Thunig*, 2 N.Y.2d 656, 143 N.E.2d 3 (1957).

> Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages. This is true, except in cases of emergency where the patient is unconscious, and where it is necessary to operate before consent can be obtained.

*Id.* (citations omitted).[2]   In the instant case, when Dr. Brown found during surgery

---

[2] The Court notes this quote refers to the wrong as an assault. Plaintiff has maintained both an AMLA claim and a claim for assault and battery and trespass. In *Donald v. Swann*, 24 Ala.App. 463, 137 So. 178 (1931), the Alabama Court of Appeals, citing *Schloendorff*, held that a medical procedure performed without the consent of a patient constituted an assault and battery or a trespass to the person. The Alabama Supreme Court later recognized that "claims of so-called 'medical battery' based on a lack of consent have been subsumed by the Alabama Medical Liability Act, § 6–5–540 et seq., Ala.Code 1975." *Henriksen v. Roth*, 12 So.3d 652, 661 (Ala. 2008) (citing *Black v. Comer*, 920 So.2d 1083, 1093 (Ala.2005)). Nevertheless, the AMLA does not preclude other causes of action such as Plaintiff's

16

that Plaintiff still had her ovaries it was not an emergency situation. Dr. Brown

acknowledges that it was not necessary or required that Plaintiff's ovaries be

removed. Plaintiff maintains that her husband had no authority to consent to

medical procedures for Plaintiff and Defendants have not suggested that Plaintiff

had executed any healthcare directive or power of attorney that would have allowed

Plaintiff's husband to consent to the removal of her ovaries.

The Court notes that Alabama law states that consent is not required for a

physician to provide health services to a person when a person is physically or

mentally unable to consent, provided, that:

> two or more licensed physicians, psychiatrists, or psychologists, or one
> licensed physician, psychiatrist or psychologists and one or more nurse
> practitioners or physician assistants, after having consultation have
> signed a written statement finding, in their judgment, that the medical
> services are necessary and that a delay in treatment would increase
> the risk to the person's life or health.

ALA. CODE § 22-8-1.  There has been no suggestion that Defendants obtained the

written statements required by Alabama law to substitute for actual consent.

Additionally, the written statements can only replace consent when the medical

services are necessary, which is not the case here.

In light of all of the above, the Court finds that Dr. Brown did not have

---

assault and battery and trespass claims. *Collins v. Ashurst*, 821 So. 2d 173, 175
(Ala. 2001), as modified on denial of reh'g (Nov. 30, 2001); *see also Drew v. Quest
Diagnostics*, 992 F. Supp. 2d 1177, 1184 (N.D. Ala. 2014) ("the AMLA was not
intended to pre-empt all other claims").

consent to remove Plaintiff's ovaries. Dr. Brown also failed to inform Plaintiff that her ovaries might be removed during the surgery.

Defendants' expert, Dr. Parnell, testified that it was reasonable for Dr. Brown to remove the ovaries. The Supreme Court of Alabama has stated that whether the standard of care was met requires expert testimony that the doctor exercised that level of reasonable care, skill, and diligence as another physician in a like case "given all of the facts then available" to the doctor. *Black v. Comer*, 920 So. 2d 1083, 1092 (Ala. 2005).  Had Dr. Brown taken advantage of all the facts available to him, including Plaintiff's medical records, he would have known in advance that Plaintiff still had her ovaries intact or at least known that he needed to question Plaintiff about her ovaries or investigate the status of her ovaries. Dr. Brown had information prior to the surgery that indicated Plaintiff still had her ovaries intact and he failed to question Plaintiff about her wishes concerning her ovaries or to discuss any risks or benefits of removing them. Defendants' expert opined it was reasonable to remove the ovaries where a doctor discovered during surgery that the patient still had ovaries and the patient's husband agreed that they should be removed. But even if it would have been reasonable under that basic scenario, Dr. Brown did not exercise reasonable care, diligence, and skill when he failed to take into account the information he had before him about Plaintiff's ovaries and failed to discuss Plaintiff's ovaries with her prior to surgery or obtain specific consent from her to remove her ovaries. Moreover, Defendants' expert also testified that he would

18

typically not remove ovaries that, as in this case, appeared normal for her age and were not hindering his surgery unless he had some other understanding that would cause him to believe they needed to be removed. Here, there was no reason why Plaintiff's ovaries needed to be removed. The Court finds that Plaintiff has met the first prong of a failure to obtain informed consent case and the Court will now turn to the second prong: whether a reasonably prudent patient, with all the characteristics of the Plaintiff and in the position of the Plaintiff, would have declined the procedure had the patient been properly informed by the physician.

In *Fain v. Smith*, the Supreme Court of Alabama adopted the objective standard for determining causation in a cause of action for negligent failure to obtain a patient's informed consent. 479 So.2d 1150 (Ala.1985). "This objective standard requires the fact-finder to consider whether a reasonable person with all the characteristics of the patient would choose to undergo the procedure with knowledge of the risk involved." *Fore v. Brown*, 544 So. 2d 955, 956 (Ala. 1989). "Furthermore, the testimony of the patient, notwithstanding hindsight, is material and relevant and is entitled to be considered by the jury." *Id.*

Here, it is clear that Plaintiff would not have agreed to have had her ovaries removed during the surgery if Dr. Brown had asked her. Plaintiff had declined to have them removed when she had her hysterectomy after researching the issue and discussing the risks and benefits with Dr. Silver. The Court also finds that a reasonable person in Plaintiff's position who had no family history of ovarian cancer

or other heightened risk of ovarian cancer and had declined to have her ovaries removed during her hysterectomy when she had been informed of the risks and benefits of the procedure, would not choose to have them removed during a subsequent surgery that was unrelated to her ovaries and that was performed less that 10 months after her hysterectomy.[3]

There is some question about whether a third prong is required under a consent case such as this. As discussed above, an AMLA case has three prongs: 1) the appropriate standard of care, 2) that the defendant health-care provider breached that standard of care, and 3) a proximate causal connection between the health-care provider's alleged breach and the identified injury. The informed consent analysis discussed above was shortened to two prongs. As explained by the Eleventh Circuit in *Looney v. Moore*:

> ... in describing the elements necessary to prove an informed consent claim, Alabama law appears not to include as an element proof of an injury. In *Giles v. Brookwood Health Services, Inc.*, 5 So.3d 533, 553–54 (Ala. 2008) and *Phelps v. Dempsey*, 656 So.2d 377, 377 (Ala. 1995) the Alabama Supreme Court explained:
>
>> The elements of a cause of action against a physician for failure to obtain informed consent are: (1) the physician's failure to inform the plaintiff of all material risks associated with the procedure, and (2) a showing that a reasonably prudent patient, with all the characteristics of the plaintiff and in the position of the plaintiff, would have declined the procedure had the patient been properly

---

[3] This is not an issue that requires additional expert testimony as the choices are understandable to the average layperson. *Pruitt*, 590 So.2d at 238 (citations omitted).

20

informed by the physician.

Noticeably missing is any requirement that the undisclosed risk
actually materialize or that any injury actually occur.

But a conclusion that injury is not required for an informed consent
claim, based on the absence of any mention of the need for injury in the
above cases, is shaky because in each of these cases there clearly was
an injury, and a serious one. So, there was no cause for the court to
focus on the need for injury as an element of the claim, and instead the
opinions explored the standards governing whether consent was
informed.

861 F.3d 1303, 1311 (11th Cir. 2017) (internal citations omitted).  In *Looney*, the

Court was faced with the question of whether an actual physical injury must be

shown under the Plaintiff's claim that the doctor failed to provide informed consent

to participate in a study. The *Looney* Court found the Plaintiffs had failed to show

that enrollment in the study caused their injuries but found that Alabama law was

unclear as to whether an actual injury must be shown and certified that question to

the Alabama Supreme Court.[4]  After the Alabama Supreme Court declined to

answer the certified question, the Eleventh Circuit concluded that under an

informed consent claim, Alabama law requires that there be an actual injury caused

by the treatment. *Looney v. Moor*e, 886 F.3d 1058, 1060–61 (11th Cir. 2018).

Notably, the Court distinguished between a no-consent claim which is analogous to

_____

[4] The Looney Court certified the following question: "Must a patient whose
particular medical treatment is dictated by the parameters of a clinical study, and
who has not received adequate warnings of the risks of that particular protocol,
prove that an injury actually resulted from the medical treatment in order to
succeed on a claim that his consent to the procedure was not informed?" *Looney*, 861
F.3d at 1314.

a battery claim and an informed consent claim which sounds in negligence. *Id.* at 1068-69.  The Court reasoned that an actual injury is required for a negligence claim, where one is not required for a no-consent claim that is based on an intentional touching. *Id.* at 1068.  In the instant case, Plaintiff has framed the issue as both a lack of consent and a lack of informed consent.  Regardless how the claim is labeled, the Court finds the injury element has been met. Plaintiff has a physical injury in that her ovaries were removed, and that injury was proximately caused by Defendants' breach of the standard of care.[5]

## CONCLUSION

For the reasons stated above, the Court finds that Plaintiff has shown that there is no genuine dispute as to any material fact and that she is entitled to judgment as a matter of law as to liability on her consent claim under the AMLA. Accordingly, Plaintiff's motion for partial summary judgment (Doc. 63) is **GRANTED**.

**DONE** and **ORDERED** this 27th day of September, 2021.

/s/ Callie V. S. Granade
SENIOR UNITED STATES DISTRICT JUDGE

---

[5] The amount of damages that injury resulted in are not before the Court at this time as the scope of Plaintiff's motion for summary judgment is limited to liability.

22